439 F.2d 233
 Stephen GROSSO, Petitioner-Appellant,
v.
Stanley RESOR, United States Secretary of the Army; Commanding Officer, Fort Hamilton, New York; Commanding General, Fort Ord, California; Commanding General, 25th Infantry Division, Viet Nam, Respondents-Appellees.
 No. 732.
 Docket 71-1109.
 United States Court of Appeals, Second Circuit.
 Argued February 8, 1971.
 Decided March 15, 1971.
 
 Bruce F. Smith, Asst. U. S. Atty., Edward R. Neaher, U. S. Atty., E.D.N.Y., for respondents-appellees.
 Before WATERMAN and FRIENDLY, Circuit Judges, and McLEAN, District Judge.*
 WATERMAN, Circuit Judge:
 
 
 1
 Stephen Grosso, a private in the United States Army serving with the 25th Infantry Division, Vietnam, but presently stationed at Fort Dix, New Jersey,[1] challenges the denial by the United States District Court for the Eastern District of New York, of his petition for either mandamus or habeas corpus relief on the alternative grounds that his induction into military service was unlawful, or that, even if he had been properly inducted, he is now entitled to a discharge.
 
 
 2
 On September 5, 1969, petitioner was ordered to report for a pre-induction physical examination. Five days later his family physician determined that petitioner was suffering from a left inguinal hernia,[2] and petitioner, armed with a letter so stating, reported for the examination on September 22. There, the military doctor found no evidence of a hernia but nonetheless referred petitioner to a civilian contract physician for surgical consultation; this doctor, who examined petitioner in a standing position, concurred with the military doctor. Petitioner was thereupon found fully qualified for induction.
 
 
 3
 On October 13 petitioner again consulted his family doctor who again diagnosed the same left inguinal hernia. On October 18, petitioner wrote to Colonel George W. Sgalitzer, Surgeon, U. S. Army Recruiting Command, requesting a review of his pre-induction examination. (On October 21, a non-military surgeon diagnosed a hernia and urged prompt surgical repair.) On November 6, 1969, a civilian contract surgeon examined petitioner and found no evidence of a left inguinal hernia, even after stress, and after jumping and bearing down. Again, petitioner was not examined in a supine position. After reviewing the medical evidence, Colonel Sgalitzer found petitioner qualified for induction under the applicable standards, specifically, AR 40-501, Ch. 2, Sec. II, ¶ 2-3h.[3]
 
 
 4
 A third private physician examined plaintiff on November 22, 1969, discovered a left inguinal hernia and urged surgical repair. On January 8, 1970, Congressman Allard Lowenstein wrote Colonel Sgalitzer requesting a new medical examination; the Colonel consented, but the Army again failed to find evidence of a hernia.
 
 
 5
 Petitioner was inducted on March 9, 1970, at Fort Hamilton, New York, within the Eastern District.
 
 
 6
 On May 20, 1970, petitioner's father wrote to Congressman John Wydler. He stated that his son was "wrongly inducted in view of his well documented medical disability — inguinal hernia condition." He further complained that "If the Army had to take my son with a medically disqualifying condition, I feel that they should not have assigned him to such strenuous duties as advanced infantry in light of his physical impairment. If my son must serve in the Army with his disability, I feel justified both morally and legally in requesting that he be transferred from the infantry to a desk or non-physical type of position where he will not continue to aggravate his existing hernia and to suffer daily pain." He concluded by asking the Congressman "to use your influence" and "at least arrange to have him transferred from the infantry as soon as possible." This letter was forwarded to the Commanding General at Fort Ord (where petitioner was stationed at the time) whose office responded by telegram received about June 26 that petitioner "will be evaluated in the U. S. Army Hospital here at Ford Ord." However, no official examination in accord therewith was had, perhaps because petitioner had visited the base dispensary there on June 15 and an examination had revealed no hernia. On July 25, while home on leave, petitioner saw his family physician, who once again diagnosed a left inguinal hernia. Petitioner claimed that on July 29 he was examined by two doctors at the Fort Hamilton dispensary who told him that he had a hernia. On August 3 a third Army doctor discovered what he thought was "probably a small indirect hernia or lipoma of the cord"; he suggested an exploratory operation. Petitioner testified that a fourth Army doctor diagnosed a hernia on August 4.
 
 
 7
 On August 7 petitioner refused surgery at Fort Lewis and was returned to duty as "medically qualified for temporary restricted duty," was given a "P-3T" profile[4] good for thirty days and was instructed to report to a medical facility on September 7. He testified that he was examined in Vietnam on October 17 and November 16, that on both occasions he was found to have a small hernia, and that on both occasions his "3" profile was continued in force and he was told to do no heavy lifting.
 
 
 8
 At no time did petitioner ask for a discharge. The instant mandamus petition was filed December 21st and was amended on December 29 to add the request for habeas corpus relief.[5]
 
 
 9
 We are not persuaded by petitioner's argument that he was unlawfully inducted because, in petitioner's words, "the Army violated its own Regulations," namely AR 40-501, Ch. 11, ¶ 16b,[6] and therefore he is entitled to release pursuant to AR 635-200, Ch. 5, Section III, ¶ 5.[7] Paragraph 16b is ambiguous; it does not make clear whether examinations of the abdomen only must be made both while in standing and supine positions, or whether examination for a hernia requires not only a standing examination but also while supine. Nor is it clear that ¶ 16b does not apply only to hernias where the intestine escapes from its proper position. Furthermore, since Chapter 11 is prefaced by the comment that it "is a guide of medical examination technique * * *," see ¶ 11-1, the proper interpretation of ¶ 16b can be made only in context of what is considered to be good medical practice. At least one Army doctor examined petitioner after forced stress, jumping and bearing down. Petitioner's extensive quotation from medical textbooks and the trial transcript leaves no doubt that this procedure is recommended and accepted as good medical practice. Although more might have been done, we think that the repeated pre-induction examinations by the military personnel, seen in toto, complied with the Regulation.[8]
 
 
 10
 Petitioner's second claim is more troublesome. AR 635-200, Ch. 5, Sec. III, ¶ 5-9, noted in the margin,[9] authorized the unit commander to discharge any individual who was not medically qualified at the time of his induction, provided that (1) a request for a discharge be made, (2) "by the individual," (3) "within 4 months" of the date of induction. On the premise that a proper and timely request was made, petitioner maintains that a medical board should have been convened, and that if the board should determine that he should not have been inducted, he should now be discharged — even if at the time of induction the Army was justified in believing that he was physically fit. Assuming, arguendo, that this interpretation of ¶ 5-9 is correct, we are unable to agree that a request of the nature contemplated by the Regulation was made to the specified officer by the proper complainant.
 
 
 11
 Paragraph 5-9 connotes some degree of formality in the application, at least to the extent that it contain the alleged reason why the induction was erroneous and that it provide a clear and unambiguous demand for discharge. Surely the visit to the Fort Ord dispensary cannot be construed to fall within the purview of ¶ 5-9. Just as clearly, however, the Army thought that petitioner's father's letter to the Congressman was a request for something, since it did discuss discharge as well as transfer of assignment. Nonetheless, in the context of his case the letter also fails to fit within the ambit of ¶ 5-9. Although we can envisage proper requests not coming directly from the inductee, nor addressed to the correct officer, the letter in this case could have been reasonably viewed by military personnel as a general complaint by an irate father. Just as ¶ 5-9 is designed to provide a triggering mechanism to invoke the medical board, so also does it serve the goal of putting the Army on notice of a demand for a discharge. This letter failed to provide such notice, and for that reason it was insufficient for the purpose of ¶ 5-9.
 
 
 12
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Petitioner's instant actions were filed in the district of induction. At oral argument the Army agreed to permit petitioner to remain at Fort Dix pending our decision. His Division is serving in Southeast Asia
 
 
 [2]
 Evidence of a hernia was first disclosed at an R.O.T.C. physical examination held in 1968
 
 
 [3]
 This Regulation provides that a registrant is not qualified for induction if he has a "hernia other than small asymptomatic umbilical or hiatal * * *."
 
 
 [4]
 A P-3 profile is a document issued by medical examiners. It is defined, and its effect is set forth, in AR 40-501, Chapter 9, Paragraph 3c(3);
 A profile containing one or more numerical designation "3" signifies that the individual has medical condition(s) or physical defect(s) which require certain restrictions in assignment within which he is physically capable of performing full military duty. Such individuals are not acceptable under procurement (entry) standards in time of peace, but may be acceptable in time of partial or total mobilization. They meet the retention standards, while in service, but should receive assignments commensurate with their functional ability.
 Of course the "P" stands for "physical condition." A "T" stands for "temporary" and means that the "3" profile is subject to future reevaluation, should the patient be cured of his physical disability. As the Regulation sets forth, personnel given a "3" profile status meet retention standards but not inductee standards, i. e., if petitioner had qualified for "3" profile status before his induction he should not have been inducted, but having qualified for it after induction he is retained in the army on active duty subject to limitation upon the work he may do.
 
 
 [5]
 A petition for a writ of habeas corpus was filed in the Western District of Washington in August, 1970. It was withdrawn without prejudice in December of the same year
 
 
 [6]
 "A thorough examination of the abdomen must be performed with the patient in the supine position as well as an examination in standing position for detection of hernia."
 
 
 [7]
 "Erroneous induction. a. Enlisted personnel erroneously inducted in the Army will be released from custody and control of the Army * * *. This paragraph is not applicable to individuals who may be processed under paragraphs 5-6b and 5-9 of this regulation
 "b. An individual claiming erroneous induction because of denial of a procedural right as provided by the Military Selective Service Act of 1967 may submit a request for release from custody and control of the Army * * *." There is no bar here to relief, even though petitioner has invoked ¶ 5-9, because his grounds for relief are independent of each other.
 
 
 [8]
 Inasmuch as we hold that the Army did not violate its Regulation, we do not ask what the result would have been if the violation had been proven. The doctrine has developed primarily in cases where the Selective Service System or the Armed Forces have violated their own regulations designed to assure procedural fairness. In the few cases that have intimated an intention to go further, cf. Nixon v. Secretary of Navy, 422 F.2d 934 (2 Cir. 1970), the petitioner was at least able to assert that but for the breach of the regulation he would have received a discharge or obtained other appropriate relief. Here there is no assurance that pre-induction examination of Grosso in a supine position would have revealed the inguinal hernia
 
 
 [9]
 AR 635-200, Ch. 5, Sec. III, ¶ 5-9, reads:
 
 Discharge of personnel who did not meet the medical fitness standards.
 
 a. Commanders specified in Section VI, Chapter 2, are authorized to order discharge of individuals who were not medically qualified under procurement medical fitness standards when accepted for induction or initial enlistment. Eligibility for discharge will be governed by the following:
 (1) A medical board finding that the individual has a medical condition which —
 (a) Would have permanently disqualified him for entry in the military service had it been detected at that time; and
 (b) Does not disqualify him from retention in the military service under the provisions of Chapter 3, AR 40-501.
 (2) A request for discharge will be submitted by the individual to his unit commander within 4 months from date of initial entry on active duty for training under the Reserve Enlistment Program of 1963. An individual found to meet the requirements of a(1) above, who elects to complete the period of service for which inducted or enlisted will be required to submit a written statement set forth in paragraph 54(3), AR 40-3.
 b. Application for discharge will be processed promptly, and separation will be accomplished within 72 hours following approval by the discharge authority.